IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 4:19CR00564-05 BSM |
| | ) | |
| COURTNEY RHODES | ) | |

## AMENDED[1]  UNITED STATES' APPEAL OF MAGISTRATE JUDGE'S RELEASE ORDER

Comes now the United States of America by and through its attorney Cody Hiland, United States Attorney for the Eastern District of Arkansas, and Julie Peters, Assistant United States Attorney, and for its Appeal of the Magistrate Judge's Release Order, respectfully requests that the Court (1) rule that the defendant should not have received a second detention hearing; and (2) reverse the magistrate's order releasing the defendant on conditions and reinstate the magistrate judge's original order detaining the defendant.  The defendant should not have received a second bond hearing after the magistrate judge's initial determination that no condition or combination of conditions would reasonably assure the safety of the community or defendant's appearance.

**I.     Procedural Background**

On October 2, 2019, a federal grand jury returned an Indictment charging COURTNEY RHODES, aka SCRAP, and eight codefendants with conspiracy to distribute and to possess with intent to distribute a controlled substance, namely, fentanyl, heroin, cocaine, and marijuana, in violation of 21 U.S.C. § 846 (Count One).  RHODES is also charged with distribution of heroin and fentanyl (Count Fourteen) and possession with intent to distribute heroin and fentanyl (Count Fifteen), in violation of 21 U.S.C. § 841(a)(1), and use of a telephone in furtherance of a drug

---

[1] The only substantive change from the United States' Appeal of Magistrate Judge's Release Order (docket no. 142) and this pleading is the addition of Paragraph VII.B.4, which was inadvertently omitted from the version filed with the Court.

trafficking crime (Count Seventeen).  On October 17, 2019, following Plea and Arraignment, U.S. Magistrate Judge Jerome T. Kearney entered an Order of Temporary Detention, reserving RHODES's right to a hearing at a later time.  Docket no. 19.

On October 24, 2019, following a contested hearing, Judge Kearney entered an Order of Detention, stating, "Following the testimony and argument of the parties, the Court finds no condition or combination of conditions that would reasonably assure the safety of the community or Defendant's appearance.  Therefore, the Defendant is ordered detained pending trial."  Docket no. 53.  On February 12, 2020, RHODES filed a motion for reconsideration of release with conditions.  Docket no. 131.  That same day, this Court's courtroom deputy entered a Notice stating, "Defendant Courtney Rhodes's motion for reconsideration of release [Doc. No. 131] is hereby referred to United States Magistrate Judge Jerome T. Kearney, who ordered defendant's detention [Doc. No. 53]."  Docket no. 132.  The United States responded in opposition to RHODES's motion for reconsideration and objected to a second hearing, Docket no. 133; however, Judge Kearney set a second hearing.  Docket no. 135.  Judge Kearney held a hearing on RHODES's motion on February 20, 2020, and directed that RHODES be released over the objection of the United States.  Docket no. 140.  The United States requested that Judge Kearney stay the release order for 24 hours to allow the United States to bring an appeal of the release order to this Court, but Judge Kearney declined to do so.  The United States then filed a motion to stay the release order, docket no. 139.  This Court granted the stay, docket no. 141, but regrettably, RHODES has already been released.

**II.    Testimony at October 24, 2019 Hearing**

Because RHODES is charged with a violation of the Controlled Substances Act for which a maximum term of imprisonment of ten years or more is prescribed, there is a statutory rebuttable

presumption that there are no conditions or combination of conditions that will reasonably assure RHODES's appearance and the safety of the community. 18 U.S.C. § 3142(e)(3). To rebut that presumption, RHODES presented testimony of two potential third party custodians, his mother and girlfriend.

RHODES's mother testified that she was willing to serve as a third party custodian and have RHODES live in her home, with his sister and her six children. RHODES's mother stated that he had worked at Popeye's and had odd jobs. She was unfamiliar with RHODES's criminal history, but indicated that every time he was put on court supervision, she took responsibility to ensure he followed his conditions. RHODES's mother recalled that RHODES was arrested in Memphis for carrying a handgun, but offered an explanation exculpating RHODES.[2] RHODES's girlfriend, who lived at a residence on "Topaz Court," also stated that RHODES worked odd jobs. She indicated that while she was caring for a son with cancer, she would still welcome RHODES into her home, describing RHODES as a "humble, kind, loving person." Neither RHODES's mother nor girlfriend was aware of his involvement in illegal drug trafficking activity, and both stated they would still serve as his third party custodian despite these charges.

Federal Bureau of Investigation (FBI) Task Force Officer (TFO) Jacob Pasman, a Detective with the Little Rock Police Department, testified about his work on the FBI task force, and

---

[2] RHODES's criminal history records reflect that he was arrested in Memphis, TN for assault and unlawful carrying of a weapon-handgun on January 21, 2015, but no disposition is noted, and while an agent requested the assistance of the Memphis Police in October 2019 to obtain information on this arrest, to date no records have been received. On February 20, 2020, after business hours, the agent finally received the police report, from the Shelby County Sheriff's Office. It tells a story quite different from RHODES's mother's version. If this Court determines that it was appropriate for RHODES to have a second detention hearing, the United States requests the opportunity to supplement the record with the information about RHODES's possession of a firearm and attempt to flee from security officers, and his subsequent conviction for unlawful possession of a weapon, as this information bears on RHODES's risk of flight and danger to the community.

3

specifically about his investigation of the "YBL" gang/heroin and fentanyl trafficking ring. TFO Pasman explained that in the past 2-3 years, fentanyl, a synthetic opioid, has become a serious problem on the streets of Little Rock. A gram of pure fentanyl can be 100 times as strong as a gram of heroin. Often, drug customers do not realize that they are buying fentanyl or a heroin-fentanyl mix instead of heroin, which leads to overdoses. TFO Pasman is aware of at least 20 overdose deaths during that time. TFO Pasman also explained that fentanyl presents a significant danger to law enforcement because of its potency, as they may be exposed to it inadvertently through touch or airborne inhalation during their law enforcement work.

With respect to the YBL investigation, TFO Pasman testified that the FBI obtained a wiretap on the telephones of codefendant MONTERRIO FULLER. RHODES was intercepted over this wire. TFO Pasman testified about one such call: on December 16, 2018, Session 1474 (Target Phone 3), RHODES, using 501-563-0923, called FULLER and asked, "You think I can buy a couple puppies from you?." TFO Pasman explained that based on experience in this investigation including information provided by a confidential source, a "couple puppies" meant a half-ounce of heroin (or heroin-fentanyl mix). During this call, RHODES indicated that his regular supplier of heroin-fentanyl was out, which was why he was contacting FULLER.

TFO Pasman also testified about the events of January 29, 2019. On that date, a confidential source made a recorded call to RHODES to purchase heroin. RHODES told the confidential source to meet him in the John Barrow area. This controlled buy was video- and audio-recorded. During the buy, RHODES asked, "What you got," meaning how much did the confidential source want to spend, and the source responded, "I need two of em," meaning 2 grams of heroin. RHODES got into the CS's vehicle. RHODES can be heard on the recording stating that "everyone wants this white sh*t," meaning RHODES has a lot of customers for his heroin/fentanyl. The video shows

4

RHODES pulling out a large plastic bag with an off-white substance in it, and then biting pieces off a larger chunk to weigh on a set of electronic scales.  The Arkansas State Crime laboratory later determined that the substance was 1.5 grams of a heroin/fentanyl mix.  RHODES counted the buy funds in front of the camera. Immediately thereafter, law enforcement conducted a traffic stop on RHODES, after RHODES ran a stop sign.  RHODES "slow rolled" for two blocks before he stopped for police.  Police recovered marijuana, the electronic scale with white residue, .3 grams of a tan powder, and 8.1 grams of what the Arkansas State Crime laboratory determined was a heroin/fentanyl mix.  TFO Pasman explained that 8.1 grams of a heroin/fentanyl mix equated to at least 81 individual doses.

TFO Pasman further testified that a confidential source provided information that prior to cooperating with the United States, the source had purchased heroin/fentanyl from RHODES in the driveway of the Topaz Court house (RHODES's girlfriend's residence).  Specifically, the confidential source related that RHODES came out of the house with a bag of tan powder smaller than a baseball, and a bag of white powder larger than a golf ball, to supply the confidential source with drugs.

TFO Pasman acknowledged that RHODES turned himself in to authorities when PASMAN notified RHODES's girlfriend that there was a federal warrant for RHODES's arrest.

### III.   RHODES's Criminal History and Noncompliance with Supervision

COURTNEY RHODES is 25 years old.  During the events of this case, RHODES was on parole and "Suspended Imposition of Sentence" for felony offenses.  RHODES has multiple prior felony convictions in three separate cases:

- Residential burglary, theft of property, and a misdemeanor controlled substance offense, in Pulaski County Case No. 2012-2743;

- Commercial burglary, breaking and entering, and theft of property, in Jefferson County Case No. 2012-369; and
- Criminal Attempt, in Pulaski County Case No. 60CR14-1017.

As reflected in the Pretrial Services Report, RHODES's corresponding probation, parole, and supervision history is as follows:

| | |
|---|---|
| 10/15/12 | Probation began |
| 02/05/13 | Absconded |
| 05/08/13 | Incarcerated |
| 05/16/13 | Release from incarceration/probation |
| 09/09/13 | Absconded |
| 03/09/15 | Returned from absconded |
| 05/01/15 | Absconded probation |
| 03/23/16 | Incarcerated |
| 08/02/16 | Probation revocation |
| 12/16/16 | Parole and SIS begin |
| 06/22/17 | Sanction hearing |
| 08/07/17 | Parole |
| 01/22/18 | Sanction/incarceration |
| 03/08/18 | Release from incarceration |
| 01/29/19 | Incarceration |
| 02/01/19 | Revoked |
| 03/02/19 | Released from incarceration |
| 07/10/19 | Parole expired |

RHODES has been on some form of supervision, whether probation, parole, or suspended imposition of sentence, since the age of 18. His history is a record of noncompliance, absconding, violations, and ensuing incarcerations, including during the events of this case. In other words, at

no time in RHODES's adult life has he demonstrated the ability to abide by the law or by court conditions of supervision.

## IV.     The Parties' Arguments at the October 24, 2019 Detention Hearing

At the October 24, 2019, hearing, RHODES argued that he should be released to the custody of his mother or girlfriend, and that he was more mature now as demonstrated by surrendering to the federal warrant.  RHODES argued that there were no threats of violence. RHODES offered a variety of conditions, including home confinement.   Notably, RHODES did not raise the possibility of drug treatment, until Judge Kearney asked RHODES to discuss it.   (The pretrial services report showed that RHODES had a substance abuse history, but that he was not interested in treatment.) Even after the Court raised this possibility, RHODES did not embrace the possibility and continued to argue for a third party custodian to be responsible for RHODES and home confinement.

The United States argued that there were no conditions or combination of conditions that would reasonably assure the safety of the community or RHODES's appearance.   The United States cited RHODES's long history of noncompliance with court supervision.   The United States further submitted that RHODES's surrender to authorities after being made aware that there was a federal warrant for his arrest and federal authorities would be coming for him did not mitigate the risk of flight.  The United States opposed the use of a third party custodian, noting that RHODES is a grown man and should not rely on this mother to keep him under her thumb, that he had not previously been successful on supervision despite her assistance, that his mother had many other responsibilities, and that RHODES had been selling drugs out of his girlfriend's house. The United States noted the danger to the community reflected by the strong evidence in this case – namely, RHODES participation in the distribution of opioids to the public.   Further, the United States noted that RHODES's supplier was still at large, and the supplier could easily deliver drugs to RHODES

at a home (such as his girlfriend's home, where RHODES previously distributed drugs), while customers could visit RHODES at home. Finally, in response to the Court's inquiry about drug treatment, the United States asserted that treatment would not ameliorate these concerns, especially because RHODES told Pretrial Services that he did not want treatment.

## V.     Judge Kearney's Ruling

At the end of the October 24, 2019, hearing, Judge Kearney declined to release RHODES, finding clear and convincing evidence that RHODES was a danger to the community and that by a preponderance of evidence RHODES was a risk of flight. Judge Kearney's comments over the course of his ruling, including during exchanges with the attorneys, were as follows:

> Here are my concerns, and they have to do with particularly, the record. I've seen other folks in this conspiracy and most of them don't have any felonies even. This gentleman does, three, I believe, and what's concerning to me is that these felonies occurred within short timespans of each other. He'd commit one, he'd get probationary sentence, within a short period of time he's committed another one, he gets another probationary sentence, he goes to prison, and then he's having to end up a revocation on parole, and or absconding allegations. Those are the things that are concerning me. So, and that's what the government is raising, in their vigorous request that he be detained. So what assurances, and the testimony I have received so far from the mother and the girlfriend is that they know him to be a loving, caring, giving person, so clearly through the evidence that has been presented from the witness stand, there is another side. And, the evidence is, given, looking at this record where he has been revoked or otherwise absconded and had issues while on probation or parole, there is another side.   So, I need you to tell me why I can believe that any conditions that I set are going to be treated differently or otherwise respected better than the ones set by other courts. . . .
>
> I understand, and I always tell, you know, when I do these I always make sure that folks know that I understand the Bail Reform Act to say that I need reasonable assurances, not guarantees. I'm not looking for a guarantee, but I have to have reasonable assurances, and what I'm looking at is a record that doesn't give me those assurances. . . .

> I'm sure you read through this report, but if you look under the health section it talks about him having talked to pretrial services officer about his use and abuse of drugs since the age of 11 all the way up to the present. I haven't heard you talk about that in your discussions here today. . . .
>
> I've listened to both counsel carefully, and as always both counsel presented their cases very well. I've listened to the testimony given here today by the mother as the girlfriend as well as the agent who came and presented testimony from the witness stand. The government is asking that the defendant be detained based on both flight and danger to the community. The most evidence in discussion regarding detention has been centered around this, the several occasions where he absconded. The thing that mitigates that to some extent is that he did turn himself in when the agent called him or when he learned the agent was looking for him, so that always is a good thing. I am however very concerned that the number of times that he has gotten himself in trouble, get probation, gets himself in trouble again, gets probation again, so he's committing crimes and or not abiding by conditions set by parole or probation, and that his continued all the way up to this year. I think both, I definitely think his mother, Ms. Rhodes, is sincere in her desire to lend a hand to the court and help with the situation to let him stay with her and try to make sure that he abides by any conditions set by the court. I think she is sincere in that. I think the girlfriend, Ms. Watson, is equally sincere. There is clearly a side to him that they are not aware of. They weren't aware of any of this. And that's not necessarily unusual, but given the number of times he's found himself in trouble and in violation of conditions set by some judge this bothers me to the point that I am unwilling today to release him. So I am going to order him to be detained. I will say this. One of the things that would have allowed me to set some conditions if he had indicated because he talked about a very long and continued use of drugs but he flat out told probation he wasn't interested in treatment. So with that also in the equation I'm going to order that he be detained pending trial. And I'm not say that if he comes up with, that if he fashions some other plan that would include some of that, and I frankly think he needs to sit in jail for a while and maybe dry out of something, I don't know, but the bottom line is he flat told probation he wasn't interested in it and he now seems to be interested in it because he faces the possibility of being locked up. But it's going to be the order of the court that he be detained.

## VI. Second Detention Hearing and Release Order

On February 12, 2020, RHODES filed a motion for reconsideration of release with conditions. The sole basis for RHODES's release was RHODES's history of drug use and his interest in obtaining drug treatment. Docket no. 131. For the reasons stated in detail below, the United States argued that this motion did not present new information or changed circumstances that would merit reconsideration of bond, and that a second hearing should not be held. Docket no. 133. Judge Kearney elected to hold a hearing, and on the basis of defense counsel's argument that RHODES had a drug problem and would like to go to treatment, and over the objections of the United States, released RHODES under conditions including that he go to "in patient drug treatment followed by chem free living pending trial" and get a mental health assessment. Docket no. 140.

**VII. RHODES Should Not Have Received A Second Detention Hearing Pursuant to 18 U.S.C. § 3142(f), And Should Be Detained Because He Is a Danger To The Community And A Flight Risk.**

**A.     A Second Hearing Was Not Warranted Under 18 U.S.C. § 3142(f)**

In his motion to reconsider, RHODES did not present new information or changed circumstances that merited reconsideration of his bond. Specifically, the extent of RHODES's drug history was known to the parties (and set forth in the pretrial services report) at the time of the original detention hearing, as was the option to request inpatient treatment. Title 18, United States Code, § 3142(f)(2)(B) provides that a bond "hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." Here, because RHODES lacked any new information with material bearing on RHODES's release, RHODES was not entitled to another bond hearing.

Case 4:19-cr-00564-BSM Document 143 Filed 02/21/20 Page 11 of 15


"As written, the reopening provision [Pub.L. No. 99–646, § 72; codified at 18 U.S.C. § 3142(f) ] is, in effect, a codification of a court's inherent reconsideration authority tempered by the understanding that, to promote finality, preserve judicial resources, and discourage piecemeal presentations, a court should not reconsider a decision based on information that could have been presented the first time around." *United States v. Pon*, No. 3:14–cr–75–J–39PDB, 2014 WL 3340584, at *9 (M.D. Fla. May 29, 2014). "Under the provision, reopening is unwarranted if the newly offered evidence was available at the time of the hearing." *Id*. (referencing *United States v. Dillon*, 938 F.2d 1412, 1415 (1st Cir. 1991); *United States v. Hare*, 873 F.2d 796, 799 (5th Cir.1989)). "Here, the Bail Reform Act's reopening provision—with its new-and-material-fact prerequisite--applies." Id. at *10. "Inherent authority to reconsider a detention order at any time before trial for any reason would negate that provision," and "would undermine the Bail Reform Act's provision of reconsideration authority to the district judge[.]" *Id.* The exercise of reconsideration authority "based on arguments that a party could have presented the first time around" does not promote judicial efficiency. *Id*. Moreover, "the new information must be of a nature that would increase the likelihood that the defendant will appear at trial and would show that the defendant is less likely to pose a danger to the community." *United States v. Watson*, 475 Fed. Appx. 598, 600 (6th Cir. 2012).

The defendant requested that his bond hearing be held in October 2019, and it was incumbent on the defendant to marshal his best proof and arguments at that time. The defendant's drug history was known at the time of the original hearing. The defendant offered, however half-heartedly, to go to rehab, and the Court declined to send the defendant. The defendant made a strategic decision to pursue his request for home confinement and a third-party custodian. Defendant's drug history and increased willingness to go to treatment does not qualify as new, material information unknown

to the defendant at the time of the original hearing. Therefore, the statute does not permit the magistrate judge to reconsider the detention issue. For that reason alone, reversal of the order releasing the defendant is appropriate.

### B. Detention is Appropriate

Regardless, the United States submits that this Court should find that RHODES should be detained. "When [a] district court, pursuant to 18 U.S.C. § 3145(b), acts on a motion to revoke or amend a magistrate's pretrial detention order, the court acts *de novo* and makes an independent determination of the proper pretrial detention or conditions for release." *United States v. Maull*, 773 F.3d 1479, 1484 (8th Cir. 1985). "[T]he rule of *de novo* determination by the district court applies not only when the accused challenges the magistrate's order, but also when the government does, as it is authorized to do by section 3145(a)(1)." *Id.* (citing *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985)). In considering whether release or detention is appropriate, the district court must consider whether the defendant is a risk of flight or a danger to the community under the factors outlined in 18 U.S.C. § 3142(g), and then consider whether any conditions or combination of conditions of release will reasonably assure both the defendant's appearance and the community's safety under 18 U.S.C. § 3142(c) and (e). *United States v. Stenger*, 536 F. Supp. 2d 1022, 1025 (S.D. Iowa 2008) (citing *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985)). The court must find by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985). The factors to be considered under 18 U.S.C. § 3142(g) include: the nature and circumstances of the offense, the weight of the evidence, the history and characteristics of the person, and the nature and seriousness of the danger to persons in the community that would exist if the defendant was released. 18 U.S.C. § 3142(g).

1. *Nature and Circumstances of the Offense and Danger to the Community*

The Indictment against the defendant alleges that he committed various drug trafficking offenses involving fentanyl, heroin, and marijuana. His charges carry a maximum penalty of 20 years' imprisonment, which triggers the presumption of detention under Title 18, United States Code, Section 3142(e)(3)(A). The Court should consider that when law enforcement conducted a traffic stop on RHODES, he "slow rolled" for two blocks before he stopped for police. At that point, police recovered various drugs, including 81 individual doses of a heroin/fentanyl mix. As set forth above, and as established by the testimony of law enforcement, RHODES was distributing fentanyl, a particularly dangerous drug that has caused numerous overdose deaths, while on state supervision. *See, e.g., United States v. Clyburn*, No. CR 18-00150, 2019 WL 2232480, at *3 (W.D. Pa. May 23, 2019) (affirming magistrate judge's decision to detain defendant who was intercepted over wiretap while on parole: "This Court has recognized the danger of drug trafficking in general, and the specific danger that addictive opioid drugs (such as the heroin at issue here) pose to the community. If Defendant were not detained, given his recent past history in allegedly engaging in drug activities from the first (or third day) day of his parole, this Court would have grave concerns about his commitment to remain free of the drug trade.") Further, the United States notes that, as came out at the hearing, RHODES had two suppliers for these dangerous opioids, only one of which is known to law enforcement and charged.

2. *Weight of the Evidence*

In considering the weight of the evidence, it is not appropriate for a court at the bond stage to "anticipate what a jury would find or what defenses might be offered, or what evidence might be excluded as hearsay or for other defects." *United States v. Townsend et al.*, 897 F.2d 989, 995 (9th Cir. 1990). It is sufficient that the United States' evidence places the defendant on notice that he

is "subject to a trial in which [he] could reasonably believe [he] might be convicted." *Id.* The Indictment against the defendant provides probable cause to believe that he committed the offenses charged. Testimony presented at the bond hearing placed the defendant on notice of the evidence against him. Based on the wiretaps and video-recorded controlled purchase of heroin/fentanyl directly from the defendant, it is clear the United States has a strong case.

3. *History and Characteristics of the Person*

"When evaluating the dangerousness of a defendant, courts may also look to conduct other than the crime with which the [d]efendant is currently charged." *Stenger*, 536 F. Supp. 2d at 1028. The defendant's history demonstrates that he has continuously engaged in criminal conduct throughout his adult life. He absconded three times while being supervised by the state, and was incarcerated on three occasions while under supervision. RHODES was on state supervision at the time of the events in this case. Additionally, RHODES's prior convictions include residential burglary, which has been recognized as a violent felony. 18 U.S.C. § 924(e). RHODES's unsuccessful history of supervision does not support his release, especially considering that he was on supervision when he committed the instant offense. Further, RHODES lacks any history of stable employment that would suggest he has the means to support himself in a law-abiding way.

4. *The Condition of Inpatient Drug Treatment and Chemical Free Living Does Not Ameliorate the Danger to the Community or Risk of Flight*

Adding the condition of inpatient drug treatment and chemical free living, as set forth in RHODES's bond conditions on February 20, 2020, does not ameliorate the danger to the community or the risk of flight presented by RHODES's release. None of the treatment facilities used by the Probation Office are "locked down" facilities, meaning the defendant is free to walk away (against his bond conditions) at any time. RHODES's previous absconscions make this a real possibility.

Additionally, it is the understanding of the United States that while in chemical free living, RHODES will be allowed to leave the facility for work or other reasons, which puts him among the public and provides an opportunity to obtain and distribute illegal drugs or engage in other unlawful conduct, such as he has previously done while on state supervision.

## CONCLUSION

The United States respectfully submits that the Magistrate Judge should not have reconsidered its decision regarding detention because RHODES did not present new information or changed circumstances that merit reconsideration of his bond, as required pursuant to 18 U.S.C. § 3142(f)(2)(B). The United States further requests that the Court reverse the order releasing RHODES and reinstate a detention order considering there are no conditions of release that will reasonably assure the safety of the community and RHODES's appearance, as the Magistrate Judge previously found.

CODY HILAND
United States Attorney

By: JULIE PETERS
Bar No. 2000109
Assistant U. S. Attorney
P. O. Box 1229
Little Rock, AR   72203
501-340-2600
julie.peters@usdoj.gov